UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
                                    )   Criminal Action
v.                                  )   No. 18-10452-PBS
                                    )
KADEEM PIMENTEL,                    )
                                    )
              Defendant.            )
_____ )

**MEMORANDUM AND ORDER**

August 9, 2019

Saris, C.J.

**INTRODUCTION**

Defendant Kadeem Pimentel ("Pimentel") is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The police discovered two shotguns and related paraphernalia in his third-floor bedroom while executing a search warrant at his residence. Arguing that the police exceeded the scope of the warrant by searching the third floor, he moves to suppress this physical evidence. He also moves to suppress statements about the shotguns he made during the search on the basis that an officer violated his Miranda rights.

After hearing, the Court **DENIES** Pimentel's motion to suppress (Docket No. 20).

**FINDINGS OF FACT**

I. **88 Fountain Street**

Pimentel has resided with his family at 88 Fountain Street in Haverhill, Massachusetts for most of his life. Ex. 6 ¶ 4 ("Aff."). 88 Fountain Street is a three-story building owned by Jean Carmen Pimentel and Mathieu Dorestant, Pimentel's grandfather and great-uncle, respectively. Dkt. No. 33 at 11:12-24, 12:18-23 ("Tr."). The main entrance through the front door has three mailboxes and doorbells. Tr. at 13:20-14:15; Exs. 1B, 1C. Off the common hallway on the first floor is a door with a lock that leads into a living space. Tr. at 43:2-11; Ex. 3. A common flight of stairs leads to the second floor, which has a door with a lock that opens into a second living space. Tr. at 26:16-20; Ex. 3. Another flight of stairs in the common area goes to the third floor and a third door with a lock, behind which is a third living area. Tr. at 26:16-20, 30:17-21, 45:11-24; Exs. 1L, 3. This third-floor living area has its own kitchen and living room and was at one time rented out to a family from the Pimentels' church. Tr. at 19:21-20:21, 24:8-23, 51:3-10; Exs. 1H, 1I, 1O. The back door of the building opens into a common staircase with doors at the rear of the second and third-floor living spaces. Tr. at 30:6-16; Ex. 3. These rear doors are not always kept locked. Tr. at 47:25-48:9, 60:5-14.

At the time of the search, Dorestant lived in the unit on the first floor, and his name was on the first-floor mailbox. Tr. at 14:23-15:18; Ex. 1D. Members of the Pimentel family, including Pimentel's grandmother and mother, resided on the second floor. Tr. at 17:25-18:3, 36:1-8, 65:19-25. The third floor had at least three residents: Pimentel in one bedroom and Diana Pimentel (his aunt) and her boyfriend in the other.[1] Tr. at 11:25-12:3, 26:3-9, 31:14-22, 32:6-9, 50:17-23. Before moving to the third floor shortly before the search, Pimentel lived in a room off the common rear hallway on the second floor, which neither party claims to be its own unit. Tr. at 54:23-21; Ex. 3; Aff. ¶ 4. Pimentel and Diana Pimentel were paying separate gas and electric bills for the third floor but not rent. Tr. at 21:1-23:6, 32:12-23; Ex. 2. Although Diana Pimentel lived on the third floor, her name was on the second-floor mailbox so that her mother could collect the mail for her when she was out. Tr. at 16:15-17:15.

## II. Pre-Search Investigation

On the evening of August 30, 2018, the Haverhill Police Department ("HPD") received a call that Pimentel had been shot in front of 88 Fountain Street. Dkt. No. 20-1 at 1 ("Report").

---

[1] It is unclear from the record whether Pimentel's girlfriend lived with him on the third floor or merely stayed there some nights, including the night of the search. Whether she lived on the third floor is immaterial to Pimentel's motion to suppress.

The police arrived at the scene, and Pimentel reported that he had been shot at while sitting in a truck by a male in a passing car. Id. The right leg of Pimentel's shorts was shredded, and he had bloody bruises on his right thigh. Id.

As Pimentel was receiving medical treatment, a neighbor approached the officers and said she had video of the incident. Id. at 2. After watching the video, the officers determined that the shot was fired from the truck in which Pimentel was sitting. Id. When the officers told Pimentel about the video, he changed his story and said another passenger in the truck had shot at him out the front passenger window. Id. The officers left the scene, and Pimentel entered 88 Fountain Street. Aff. ¶ 5.

Two officers found Connor Shine, the owner of the truck, and asked him about the incident. Report at 3. He said Pimentel, who regularly carries a long gun in his waistband, fired the shot. Id. Based on Shine's description, the officers believed the firearm was a sawed-off shotgun. Id. They also noted that Pimentel's injuries were consistent with a downward shot from his waist. Id.

Based on this information, Detective Dana Burrill, one of the investigating officers, applied for and received a no-knock search warrant. Tr. at 96:13-15; Ex. 4. The issued warrant listed the location to be searched as follows, in relevant part: "88 Fountain St. 2nd floor is a 3 story, multi-unit building,

with a basement, numbered 88 on the left side of the front deck . . . which is occupied by and/or in possession of Kadeem Dashawn Pimentel, Maya Garrow [Pimentel's girlfriend], Diana Pimentel, and Phebe Pimentel [Pimentel's grandmother]." Ex. 4. "2nd floor" was added above the typed text in handwriting, followed by "DB" (Dana Burrill) in a circle. Tr. at 102:22-25; Ex. 4. Detective Burrill added "2nd floor" at the request of the clerk of the judge who approved the warrant because the HPD's records listed Pimentel as living on the second floor based on prior encounters with him. Tr. at 99:4-100:15, 103:1-24.

### III. **Execution of Search**

About ten officers, including Detective Burrill, returned to 88 Fountain Street around 2:30 a.m. on August 31 to execute the search warrant. Tr. at 84:23-85:2, 85:11-18, 102:11-13. They knocked down the front door, proceeded up the stairs to the second floor, and knocked down the locked door to the second-floor living area. Tr. at 38:3-10, 85:19-86:15, 123:25-124:17. They secured everyone sleeping on the second floor and brought them to the second-floor living room. Tr. at 86:16-19, 124:21-125:10.

Detective Burrill then proceeded through the open rear door in the second-floor kitchen onto the back stairwell. Tr. at 48:10-19, 87:2-9. He encountered Pimentel coming down from the third floor. Tr. at 87:10-11; Aff. ¶ 6. After asking who else

5

was on the third floor, Detective Burrill ordered Pimentel to join the other residents in the living room on the second floor. Tr. at 87:24-88:5; Aff. ¶¶ 7-8. Detective Burrill and two other officers entered the third floor through the open door at the top of the rear stairs, collected Diana Pimentel, her boyfriend, and Pimentel's girlfriend, and brought them to the second-floor living room. Tr. at 35:17-22, 88:1-89:24.

Once all the residents were in the living room, Sergeant Andrea Fogarty, the supervisor of the entry team, advised them of their Miranda rights. Tr. at 89:25-91:1, 123:19-24, 125:9-20. The officers also passed around the search warrant. Tr. at 116:22-117:2. Detective Burrill then pulled Pimentel into the kitchen and asked him if he had a gun and, if so, where it was. Tr. at 37:2-10, 91:2-13; Aff. ¶ 13. Pimentel said he had two shotguns in his bedroom. Tr. at 91:14-92:7. He also stated in response to questioning from Detective Burrill that he had a "long [shotgun] and a short one," he shot himself with the short gun, and his girlfriend had purchased the full-sized shotgun in New Hampshire where a firearms license was not needed. Report at 4. Detective Burrill went to Pimentel's bedroom on the third floor and found a sawed-off shotgun with a spent shell in the chamber, a second shotgun loaded with six shells, a firearm safety lock and scope, and a backpack with four more shells. Tr. at 92:8-13; Ex. 4. After securing this evidence, the officers

6

searched the rest of the second and third floors. Tr. at 107:23-108:9. At no point during the encounter was Pimentel given a written Miranda waiver or consent to search form. Tr. at 118:17-120:16, 128:11-7. He did not orally consent to the search either.

IV. **Procedural History**

Pimentel was indicted on November 28, 2018 with one count charging him with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moves to suppress the incriminating statements he made to the officers in the kitchen on the basis that Detective Burrill violated his Fifth Amendment rights by denying his request to speak to a lawyer. He also moves to suppress the shotguns and related paraphernalia seized from his third-floor bedroom, arguing that the police obtained the evidence in violation of his Fourth Amendment rights. The Court held an evidentiary hearing at which Detective Burrill, Sergeant Fogarty, and Diana Pimentel testified. Pimentel submitted an affidavit in support of his motion.

## DISCUSSION

I. **Fifth Amendment**

   A. **Legal Standard**

Pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), "law enforcement officers [must] employ procedural safeguards to ensure that a suspect's Fifth Amendment privilege against self-

7

incrimination is respected." United States v. Jackson, 544 F.3d 351, 356 (1st Cir. 2008). To comply with these requirements, an officer "must give a suspect proper Miranda warnings before he is subjected to custodial interrogation." Id. A suspect is in custody when "viewed objectively, [the] circumstances constitute the requisite 'restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Hinkley, 803 F.3d 85, 90 (1st Cir. 2015) (quoting United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)). An officer interrogates a suspect when he uses "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Jackson, 544 F.3d at 357 (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). "Any statements obtained as a result of custodial interrogation in the absence of Miranda warnings must be suppressed." Id. at 356.

Once the police give the required warnings, a suspect may invoke his Miranda rights by clearly and unambiguously requesting a lawyer or stating he wishes to remain silent. See Berghuis v. Thompkins, 560 U.S. 370, 381-82 (2010). The police must immediately stop questioning a suspect who invokes his Miranda rights. See Maryland v. Shatzer, 559 U.S. 98, 104 (2010). On the other hand, a suspect can waive his Miranda rights if he does so knowingly, intelligently, and voluntarily.

Id. A waiver can be either express or implied through uncoerced statements after the suspect acknowledges that he understood his Miranda rights. Hinkley, 803 F.3d at 91. The Government bears the burden to show by a preponderance of the evidence that a suspect validly waived his Miranda rights. United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003). If a suspect waives his Miranda rights and then later makes a clear request for a lawyer or asserts the right to remain silent, the police must cease the interrogation. See United States v. Bezanson-Perkins, 390 F.3d 34, 40 (1st Cir. 2004).

**B.  Analysis**

The Government does not dispute that Pimentel was subject to custodial interrogation when Detective Burrill questioned him in the kitchen. The admissibility of Pimentel's statements concerning the firearms in his bedroom therefore depends on whether Detective Burrill conducted his interrogation in compliance with the requirements of Miranda. Pimentel claims the police 1) failed to Mirandize him before interrogating him and 2) ignored his multiple clear requests for a lawyer.

Detective Burrill and Sergeant Fogarty both testified that Sergeant Fogarty Mirandized all of the occupants of the second and third floors as a group in the second-floor living room. Tr. at 89:25-91:1, 125:9-20. According to Detective Burrill, who conducted the interrogation, Pimentel did not request a lawyer

9

at any point. Tr. at 92:14-93:9. Sergeant Fogarty, who was in the living room with the Pimentel family during the interrogation, stated that she did not hear him request a lawyer either. Tr. at 126:10-18. Diana Pimentel, Pimentel's aunt, testified that the officers did not Mirandize the group and that, from the living room, she heard Pimentel request a lawyer in the kitchen. Tr. at 39:8-10, 52:25-53:6. In a sworn affidavit, Pimentel claims that the officers did not Mirandize him until after they retrieved the firearms from his bedroom and that he asked for an attorney three times while Detective Burrill was interrogating him. Aff. ¶¶ 13-16. The Court gives little weight to this affidavit, however, in the absence of live testimony in open court. See United States v. Phillipos, 849 F.3d 464, 469 (1st Cir. 2017) (explaining that, pursuant to United States v. Baskin, 424 F.3d 1 (1st Cir. 2005), a district court need not credit a defendant's affidavit in ruling on a motion to suppress where the defendant refuses to submit to cross-examination), cert. denied, 138 S. Ct. 683 (2018).

Based on the testimony of the two officers, the Court concludes by a preponderance of the evidence that the police Mirandized Pimentel before interrogating him in the kitchen. The testimony of Sergeant Fogarty, who administered the warnings herself, is especially persuasive. Diana Pimentel admitted that the only statement she remembers from the five to ten minutes of

the interrogation was Pimentel's request for a lawyer. Tr. at 74:13-75:23. This admission renders it impossible to determine from her testimony exactly when, if at all, Pimentel invoked his right to counsel. Pimentel validly waived his Miranda rights by voluntarily answering Detective Burrill's noncoercive questions. See Hinkley, 803 F.3d at 91. While Pimentel emphasizes that the officers could have, but did not, give him a waiver form to sign, a waiver of Miranda rights need not be express. See United States v. Mejia, 600 F.3d 12, 17 (1st Cir. 2010). The Court therefore denies the motion to suppress the statements Pimentel made to Detective Burrill about the firearms.

## II. Fourth Amendment

### A. Scope of the Warrant

*1. Legal Standard*

"The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures in the absence of a warrant supported by probable cause." United States v. White, 804 F.3d 132, 136 (1st Cir. 2015). A valid search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." United States v. Mousli, 511 F.3d 7, 12 (1st Cir. 2007) (quoting U.S. Const. amend. IV). Reasonable mistakes in the description of the premises do not invalidate an otherwise valid warrant. See Maryland v. Garrison, 480 U.S. 79, 85 (1987). In deciding whether such a mistake is

reasonable, courts focus on the information available to the police at the time they secured the warrant. See id.

In turn, the "authority to search conferred by a warrant is circumscribed by the particular places delineated in the warrant and does not extend to other or different places." United States v. Fagan, 577 F.3d 10, 13 (1st Cir. 2009). A search violates the Fourth Amendment if its "scope . . . exceeds that permitted by the terms of a validly issued warrant." Horton v. California, 496 U.S. 128, 140 (1990). To determine the scope of a warrant, courts review the warrant and affidavit "in a common sense manner," avoiding "hypertechnical readings." United States v. Peake, 804 F.3d 81, 87 (1st Cir. 2015) (quoting United States v. Bonner, 808 F.2d 864, 868 (1st Cir. 1986)).

Courts have developed special rules for warrants in the context of multi-unit buildings. Generally, "a warrant that authorizes the search of an undisclosed multi-unit dwelling is invalid." Mousli, 511 F.3d at 12 (quoting United States v. Pérez, 484 F.3d 735, 741 (5th Cir. 2007)). The warrant must instead "specify the precise unit that is the subject of the search," id. (quoting Pérez, 484 F.3d at 741), which can be via the name of the unit's occupant, see United States v. Vaughan, 875 F. Supp. 36, 42 (D. Mass. 1995). On the other hand, "a warrant for a single-unit residence authorizes the search of that entire dwelling regardless of who the area being searched

belongs to, so long as the items delineated in the warrant could reasonably be found in the searched area." United States v. McLellan, 792 F.3d 200, 212 (1st Cir. 2015).

When executing a warrant, officers may search "structures that are part of the premises specified in a search warrant" and "structures not explicitly mentioned in a warrant but that reasonably can be viewed as a part of the described premises." Fagan, 577 F.3d at 13. In the context of multi-unit buildings, courts must determine whether the space the police searched is part of the unit specified in the warrant. See United States v. Ferreras, 192 F.3d 5, 8, 10-11 (1st Cir. 1999) (affirming the district court's denial of a motion to suppress because, although the warrant only authorized a search of the "2nd floor apartment and basement" and the police found the relevant evidence in the attic above the second floor, the district court reasonably determined that the attic was part of the second-floor unit). This fact-specific analysis asks 1) whether the space opens only into the unit specified in the warrant or instead into a common area or the outside; 2) whether the space is equipped for independent living (e.g., has separate utilities, doorbell, mailbox, bathroom, and kitchen); and 3) whether the occupant of the space has access to the unit specified in the warrant. See Ferreras, 192 F.3d at 10-11.

*2. Analysis*

Pimentel correctly does not challenge the validity of the warrant. The officers sought a warrant to search the second floor of 88 Fountain Street on the mistaken belief that Pimentel resided on that floor. He had lived on the second floor for many years until shortly before the search. The HPD had multiple encounters with him during that time and listed him in its records as residing on the second floor. The officers' mistake in seeking a warrant for the second floor based on probable cause to believe Pimentel had a firearm was reasonable and does not invalidate the warrant. See Mousli, 511 F.3d at 13 (upholding the validity of a warrant to search the defendant's residence because, although the warrant was mistakenly overbroad in listing an entire multi-unit building, the officers took reasonable steps to try to investigate the defendant's address before applying for the warrant). The warrant was also sufficiently particularized because it listed both the floor of the building to be searched and the individuals whom the officers believed occupied the unit on that floor.

Pimentel focuses instead on the execution of the search. The warrant authorized a search of "88 Fountain St. 2nd floor," Ex. 4, and the police found the firearms and related paraphernalia on the third floor, not the second floor. Pimentel therefore argues that the search exceeded the scope of the

14

warrant. The Government responds, and Pimentel vigorously contests, that the second and third floors are part of the same unit and so the warrant authorized a search of the third floor.

Based on the layout of the building, the Court concludes that the third floor is a separate unit from the second floor. Both the front and rear common doors and staircases lead to the third-floor unit, so the occupants of the third floor do not have to pass through the private areas on the first and second floors. The third floor has its own doorbell, mailbox, kitchen, and utilities and therefore is equipped for independent living. The front and rear doors of the living spaces on the second and third floors all have locks, although the occupants did not always use them. The Pimentels even rented out the third floor at one time as a separate unit to a family from their church.

The Government points to the Pimentels' communal living arrangements to argue that the second and third floors comprise a single unit. For example, Pimentel recently moved from the second to the third floor, Diana Pimentel sends her mail to the second-floor mailbox, and she was on the second floor doing her mother's hair on the evening in question. But this level of interaction between the occupants of the second and third floors is insufficient by itself to render the two floors a single unit in light of the contrary evidence just described.

The Government next argues that, even if the third floor is a separate unit, the warrant authorized a search of the third-floor bedroom because Pimentel occupied it. The Government points to the description of the premises in the warrant as "88 Fountain St. 2nd floor . . . which is occupied by and/or in possession of Kadeem Dashawn Pimentel" and others. Ex. 4. Pimentel counters that Detective Burrill's hand-written addition of "2nd floor" to the description of the premises demonstrates an intent to authorize a search of only the second floor. The Court need not resolve this complex issue because, even if the warrant only authorized a search of the second floor and the officers exceeded its scope by searching the third-floor bedroom, the good-faith exception to the exclusionary rule applies.

### B. Good-Faith Exception

#### 1. *Legal Standard*

Finding that a search violated the Fourth Amendment does not automatically lead to the suppression of physical evidence gathered during that search. See United States v. Levin, 874 F.3d 316, 321-22 (1st Cir. 2017). The exclusionary rule "is 'not a personal constitutional right' but a remedy whose 'sole purpose . . . is to deter future Fourth Amendment violations.'" Id. (alteration in original) (quoting Davis v. United States, 564 U.S. 229, 236-37 (2011)). Accordingly, suppression is

16

warranted only when "its deterrence benefits outweigh its substantial social costs." Id. at 322 (quoting Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. (alterations in original) (quoting Davis, 564 U.S. at 238).

    *2. Analysis*

The Court agrees with the Government that the officers acted in good faith in searching Pimentel's third-floor bedroom. As previously noted, the officers made a reasonable mistake in seeking a warrant that authorized a search of the second floor, which is where Pimentel resided until a few weeks before the evening in question. When he secured the warrant, Detective Burrill did not know that Pimentel lived on the third floor or act in reckless disregard of the truth in failing to investigate further which floor Pimentel occupied. In executing the warrant, the officers reasonably focused their efforts on identifying and questioning Pimentel and searching his bedroom once he told them he had firearms in his bedroom.

The application of the good-faith exception here follows from the First Circuit's decision in United States v. Woodbury, 511 F.3d 93 (1st Cir. 2007). In Woodbury, the police received a

warrant authorizing a search of the defendant's apartment at "# 7 Leisure Lane Windham, Maine believed to be the bottom floor left apartment." Id. at 95. When the police attempted to execute the warrant, they discovered that the defendant did not in fact live in the bottom-floor left apartment. Id. The occupant of that apartment directed the officers to the defendant's unit, which was elsewhere in the building. Id. The officers executed the search there and discovered a pistol. Id. Invoking the good-faith exception, the First Circuit declined to suppress the pistol. Id. at 99-100. The court explained that the officers' mistake in the warrant did not render the warrant so facially deficient that they could not in good faith rely on it to search the defendant's apartment. Id. at 100. And the officers showed their good faith by refraining from searching the wrong apartment once they realized their mistake. Id.

While the warrant in this case did not hedge in specifying which unit the officers believed Pimentel occupied, Woodbury's application of the good-faith exception still controls. In both cases, the police secured a warrant for the purposes of searching the apartment of a suspect but made a reasonable mistake in identifying that apartment. Since Detective Burrill's affidavit in support of the warrant application focused exclusively on Pimentel's suspected possession of a firearm and the warrant listed Pimentel's name, the officers acted in good

18

faith in believing the warrant authorized them to search his bedroom even though it was not on the second floor. Cf. United States v. Bershchansky, 788 F.3d 102, 114 (2d Cir. 2015) (finding the good-faith exception inapplicable where the agents searched Apartment 1 based on a warrant authorizing a search of Apartment 2 because, although the agents intended to target the defendant and erroneously believed he lived in Apartment 1, the warrant did not mention his name).

Furthermore, the Court cannot conclude that the officers' search of the rest of the second and third floors after securing the evidence from Pimentel's bedroom evinced a lack of good faith. The warrant described the premises to be searched as both the "2nd floor" and the unit "occupied by and/or in possession of" Pimentel, his aunt, his girlfriend, and his grandmother, three of whom lived on the third floor and one of whom was on the second. Ex. 4. The officers here made a "honest mistake[] . . . in the dangerous and difficult process of" executing a search warrant, which does not justify suppression. Garrison, 480 U.S. at 87. Because the officers acted in good faith when they searched Pimentel's third-floor bedroom, the Court declines to suppress the physical evidence they seized.[2]

---

[2] The Court therefore need not address the Government's alternative argument that suppression is not warranted because of the inevitable discovery doctrine. Additionally, Pimentel appears to argue that the physical evidence should be suppressed

**ORDER**

Pimentel's motion to suppress (Docket No. 20) is **DENIED**.

SO ORDERED.

                                          /s/ PATTI B. SARIS
                                          Hon. Patti B. Saris
                                          Chief United States District Judge

---

as the unlawful fruits of a Fifth Amendment violation. This argument fails to the extent it rests on his Miranda claim because there was no Miranda violation and, even if there were, "the Miranda rule is not subject to the 'fruits of the poisonous tree' doctrine." United States v. Materas, 483 F.3d 27, 32 (1st Cir. 2007). Nor do the facts suggest that Pimentel's statements were involuntary and thus elicited in violation of the Fifth Amendment. See United States v. Jacques, 744 F.3d 804, 809 (1st Cir. 2014).